**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| EMPLOYEES' RETIREMENT PLAN OF THE NATIONAL EDUCATION ASSOCIATION, <br><br> *and* <br><br> THE RETIREMENT BOARD OF THE EMPLOYEES' RETIREMENT PLAN OF THE NATIONAL EDUCATION ASSOCIATION OF THE UNITED STATES, <br> 1201 16th St NW, Suite 210 <br> Washington, D.C. 20036, <br><br>                             *Plaintiffs,* <br><br> v. <br><br> CLARK COUNTY EDUCATION ASSOCIATION <br> 4230 Mcleod Drive <br> Las Vegas, NV 89121. <br><br>                         *Defendant.* | Civil Action Number 1:20-cv-3443 |

**COMPLAINT TO ENFORCE IN PART AND VACATE/MODIFY IN PART
AN ARBITRATION AWARD AND FOR THE COLLECTION OF
UNPAID CONTRIBUTIONS, INTEREST, LIQUIDATED DAMAGES, AND
ATTORNEYS' FEES AND COSTS**

1.     Plaintiffs Employees' Retirement Plan of the National Education Association of the

United States ("Retirement Plan") and the Retirement Board of the Retirement Plan, consisting of

Thomas Zembar, Nancy McKenzie, Maggie Copeland, Casey Anthony, Tom Israel, Steven

Williams, Chaka Donaldson, Donna Harris-Aikens, Noel Candelaria, Dale Templeton, Robert

Walsh , Howard Awrich, Michael Hairston, Joel Solomon, and Tida Strey, ("Retirement Board"),

(all Plaintiffs  collectively referred to as, "Retirement Plan"), through their undersigned counsel,

1

hereby file this Complaint pursuant to (a) Sections 502(a)(3), (d)(1), (g)(2) and 515 of the Employee Retirement Income Security Act of 1974, *as amended* ("ERISA"), 29 U.S.C. §§ 1132(a)(3), (d)(1), (g)(2) and 1145, and Section 301(a) of the Labor Management Relations Act of 1947, *as amended*, 29 U.S.C. § 185(a) to collect unpaid contributions, interest, liquidated damages, and attorneys' fees and costs owed by the Defendant Clark County Education Association ("CCEA"); and (b) ERISA Sections 4221(b)(2), (3), and 4301(a)(1), 29 U.S.C. §§ 1401(b)(2), (3), and 1451(a)(1), and 9 U.S.C. § 9, seeking to enforce in part and vacate/modify in part an arbitration award dated November 20, 2020 by Arbitrator Adam P. Segal in the American Arbitration Association case styled *Clark County Education Association v. Employees' Retirement Plan of the National Education Association,* AAA Case Number: 01-19-0000-4728 ("Award"). A complete and accurate copy of the Award is attached as Exhibit A.

## JURISDICTION AND VENUE

2.      Jurisdiction is conferred upon this Court for delinquent employee benefit plan contributions and for violation of the Retirement Plan's governing documents and collective bargaining agreement by Sections 502(e) and (f) of ERISA, 29 U.S.C. §§ 1132(e) and (f), and Section 301(c) of the LMRA, 29 U.S.C. § 185(c). Jurisdiction is conferred on this Court to enforce, vacate, or modify an arbitration award relating to multiemployer withdrawal liability by Sections 4221(b)(2) and Section 4301(c) of ERISA, 29 U.S.C. §§ 1401(b)(2) and 1451(c). Jurisdiction also lies under 28 U.S.C. § 1331.

3.      Venue is proper in this Court pursuant to Sections 502(e)(2) and 4301(d) of ERISA, 29 U.S.C. §§ 1132(e)(2), 1451(d), because the Retirement Plan is administered in this District.

## PARTIES

4.     The Retirement Plan is an employee pension benefit plan as defined by ERISA Section 3(3), 29 U.S.C. § 1002(3), as well as a multiemployer plan within the meaning of ERISA Section 3(37)(A), 29 U.S.C. § 1002(37)(A), and ERISA Section 4001(a)(3), 29 U.S.C. § 1301(a)(3).

5.     Members of the Retirement Board are fiduciaries within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A), and they bring this action in their fiduciary capacity on behalf of themselves and the Retirement Plan's participants and beneficiaries for the purpose of collecting withdrawal liability and unpaid contributions. The Retirement Board administers and conducts the business of the Retirement Plan at 1201 16th St NW, Suite 210, Washington, D.C. 20036.

6.     CCEA is an "employer in an industry affecting commerce" as defined in Section 3(5), (9), (11), and (12) of ERISA, 29 U.S.C. § 1002(5), (9), (11), and (12).

7.     CCEA is a labor organization organized in the State of Nevada as a nonprofit organization and has a corporate mailing address of 4230 Mcleod Drive, Las Vegas, NV 89121.

## FACTUAL BACKGROUND

8.     The Retirement Plan was originally established by the National Education Association ("NEA") in or about October 1959 as a single employer plan. Pursuant to the provisions of the Pension Protection Act of 2006, the Retirement Plan filed an election with the Pension Benefit Guaranty Corporation ("PBGC") in August 2007 to convert to multiemployer plan status effective as of January 1, 2004.  That election was approved by the PBGC.

9.     NEA is the settlor and plan sponsor of the Retirement Plan within the meaning ERISA Section 3(16)(B), 29 U.S.C. § 1002(16)(B).

10.     The Retirement Board is the administrator of the Retirement Plan within the meaning of ERISA Section 3(16)(A), 29 U.S.C. § 1002(16)(A).

11.     The Retirement Plan provides benefits to the employees of NEA and the other related participating organizations.

12.     The Retirement Plan's Plan Year runs concurrently with the calendar year, from January 1 through December 31.

13.     NEA is a national labor union with approximately 3.2 million members, including affiliate organizations in every state and in more than 14,000 communities across the United States. NEA primarily represents teachers and other employees of public schools throughout the United States.

14.     CCEA became a contributing employer to the Retirement Plan in 2003. Until April 2018, NEA's local affiliate in the Clark County school district of Nevada was CCEA. NEA's state affiliate in Nevada is the Nevada State Education Association ("NSEA").

15.     John Vellardita is the current Executive Director of CCEA and has been in that position since October 1, 2011.  As the Executive Director of CCEA, Mr. Vellardita is also CCEA's registered agent for service of process.

A.      **Plan Governance and Participation**

16.     The Retirement Plan is administered under the direction and supervision of its 15-member Retirement Board, which is comprised of seven members appointed by the NEA Executive Committee, seven members selected by staff union organizations, and a 15th member who is elected by the other 14 members and who must be a retiree receiving benefits under the Retirement Plan.

17.     All actions of the Retirement Board may be reviewed from time to time by the NEA Executive Committee. NEA's 9-member Executive Committee is comprised of three executive officers and six members elected at large by delegates to its Representative Assembly.   The Executive Committee has the sole and exclusive authority to amend the terms of the Retirement Plan's plan document. A complete and accurate copy of the Retirement Plan's Fourth Restatement as of January 1, 2015 ("Plan Document"), with all amendments, is attached hereto as Exhibit B.

18.     NEA also has an Executive Director, who oversees its day-to-day operations but is not a member of its Executive Committee or Retirement Board. During all times relevant to this case, NEA's Executive Director was John Stocks.

19.     The day-to-day operations of the Retirement Plan are conducted at NEA headquarters in Washington, DC by NEA's Human Resources Department. During all times relevant to this case, such day-to-day operations were principally conducted by Vijaya Krishna, Secretary to the Retirement Board and Associate Director of Human Resources, and James Groves, Senior Benefits and Project Specialist.

20.     Among the duties performed by the Human Resources Department on behalf of the Retirement Plan is the distribution of notices and disclosures required under ERISA, including the Annual Funding Notice required under ERISA Section 101(f), 29 U.S.C. § 1021(f).  On behalf of the Retirement Plan, Annual Funding Notices were distributed to participants, beneficiaries, and participating employers, including CCEA, during all years relevant to this Action, including the Annual Funding Notices for Plan Years 2014 thru 2018.

21.     At the end of Plan Year 2017, the Retirement Plan had 2,834 participants and 22 contributing employers.

22.     Employers are permitted to participate in the Retirement Plan pursuant to the terms of its Plan Document.  In order for a new employer to join the Retirement Plan as a contributing employer, the Plan Document must be amended by the Executive Committee.  Similarly, in order to terminate a contributing employer from the Retirement Plan, the Plan Document must be amended by the Executive Committee.

**B.     Withdrawal Liability**

23.     As a multiemployer defined benefit pension plan, the Retirement Plan is required to assess withdrawal liability against employers that suffer a complete withdrawal from the plan. ERISA Section 4201(a), 29 U.S.C. § 1381(a).  A complete withdrawal occurs when an employer either permanently ceases to have an obligation to contribute under the plan or permanently ceases all covered operations under the plan.  ERISA Section 4203(a), 29 U.S.C. § 1383(a).  Withdrawal liability generally consists of a plan's allocated share of its liabilities for its unfunded vested benefits ("UVBs").  ERISA Section 4201(b)(1), 29 U.S.C. § 1381(b)(1).  A plan's UVBs are allocated to its withdrawn employers in accordance with one of the methodologies set out in Section 4211 of ERISA.  ERISA Section 4211(a), 29 U.S.C. § 1391(a).

24.     The Retirement Plan has adopted what is often referred to as the "rolling five method" for calculating the withdrawal liability of contributing employers, as described in ERISA Section 4211(c)(3), 29 U.S.C. § 1391(c)(3).

25.     Withdrawn employers are permitted to pay their assessed withdrawal liability in either a single lump sum or in installments, the amount of each installment being determined by a statutory formula.  ERISA Section 4219(c), 29 U.S.C. § 1399(c).

26.     An employer contesting an assessment of withdrawal liability must do so by filing a "request for review" to the plan sponsor.  ERISA Section 4219(b)(2), 29 U.S.C. § 1399(b)(2).

An employer dissatisfied with the plan sponsor's determination regarding its request for review and that seeks to challenge that determination must demand arbitration.   ERISA Section 4221(a)(1), 29 U.S.C. § 1401(a)(1).

27.     In any such arbitration, the factual determinations underlying a plan's withdrawal liability determinations are presumed correct unless the party contesting the determination shows by a preponderance of the evidence that the determination was unreasonable or clearly erroneous. ERISA Section 4201(a)(3)(A), 29 U.S.C. § 1401(a)(3)(A).

28.     The determination of a defined benefit pension plan's liabilities requires the use of various actuarial assumptions and methods.   In order to successfully challenge a withdrawal liability assessment based upon the actuarial assumptions or methods used, an employer must show by a preponderance of the evidence that the actuarial assumptions and methods used in the determination were, in the aggregate, unreasonable (taking into account the experience of the plan and reasonable expectations), or the plan's actuary made a significant error in applying the actuarial assumptions or methods.   ERISA Section 4221(a)(3)(B), 29 U.S.C. § 1401(a)(3)(B).

29.     Notwithstanding the pendency of a request for review or arbitration, a withdrawn employer remains required to make its withdrawal liability installment payments in accordance with the schedule provided by the plan in the assessment.   ERISA Section 4219(c)(2), 29 U.S.C. § 1399(c)(2).

30.     Following the issuance of the arbitration award, either party may initiate litigation within 30 days to enforce, vacate, or modify the arbitrator's award.   ERISA Section 4221(b)(2), 29 U.S.C. § 1401(b)(2).   In such a proceeding, the factual determinations of the arbitrator are presumed correct, but may be rebutted by a clear preponderance of the evidence.   ERISA Section 4221(c), 29 U.S.C. § 1401(c).   Legal determinations made by the arbitrator are, however, subject

to *de novo* review. *Combs v. Classical Corp.,* 931 F.2d 96, 102 (D.C. Cir. 1991); *United Mine Workers of Am. 1974 Pension Plan v. Energy W. Mining Co.,* Civ. A. No. 1:18-cv-01905, 2020 BL 192243 (D.D.C. May 22, 2020).

31.     The Retirement Plan's enrolled actuary for Plan Years 2015 to 2018, was David Hudecek of Buck Global, LLC.

32.     For all Plan Years between January 1, 2007 and December 31, 2017, the Retirement Plan used the same discount rate to value its liabilities for both minimum funding and withdrawal liability purposes.

33.     For all Plan Years between January 1, 2015 and December 31, 2017, the Retirement Plan used 7.3% to value its liabilities for both minimum funding and withdrawal liability purposes.

34.     Section 12.4 of the Retirement Plan's Plan Document states "upon the advice of the Plan's actuary, [the Retirement Board] shall adopt (and modify as appropriate) a reasonable interest rate assumption used to calculate the value of unfunded vested benefits under the Plan which will be uniformly applicable to withdrawals by all Employers. Unless and until such interest rate is adopted, the Plan shall use the interest rate assumption used for funding purposes on the date of the withdrawal."

35.     In early 2017, Retirement Plan Actuary David Hudecek independently commenced a review of the assumptions and methodologies used by the Retirement Plan to calculate withdrawal liability.  Among the assumptions he began to review was the discount rate used to value the Retirement Plan's UVBs.  Exhibit A at 5.

36.     On March 7, 2017, at a regular meeting of the Retirement Board, Retirement Plan Actuary David Hudecek raised the issue of the Retirement Plan's discount rate for withdrawal liability. The Retirement Board chair appointed a Withdrawal Liability Committee consisting of

then-Retirement Board members Dan Doonan, Bob Walsh, and Michael Edwards, along with Retirement Plan attorney Paul Green, Retirement Board Secretary Vijaya Krishna, and Retirement Plan Actuary David Hudecek.

37.     On May 12, 2017, the members of the Withdrawal Liability Committee met via conference call. During the Withdrawal Liability Committee's conference call on May 12, 2017, Retirement Plan Actuary David Hudecek made a verbal and written presentation entitled "Withdrawal Liability Assumptions" to the Withdrawal Liability Committee on discount rates for withdrawal liability purposes.

38.     On May 16, 2017, at a regular meeting of the Retirement Board, the discount rates for withdrawal liability purposes were discussed.

39.     On September 12, 2017, at a regular meeting of the Retirement Board, Retirement Plan Actuary David Hudecek made a verbal and written presentation. As part of his presentation, Mr. Hudecek recommended that the Retirement Plan reduce its discount rate from 7.3% to 5% for withdrawal liability purposes.  Mr. Hudecek explained that he chose the 5% because it reflected a low risk investment environment, which better reflects the position of a withdrawn employer that has fully settled and defeased itself of its ongoing funding obligations to the Retirement Plan by having withdrawn, and that using a fixed number would avoid volatility from year to year.

40.     In making his recommendation for the appropriate discount rate to use for employer withdrawals, Mr. Hudecek reminded the Retirement Board that, as Retirement Plan Actuary, he had sole authority to select the actuarial assumptions, including the discount rate, used to value the Retirement Plan's liabilities for withdrawal liability purposes.   Additionally, Mr. Hudecek's conclusion that the discount rate used for withdrawal liability purposes must be reduced to 5% was

entirely his own, and not the product of any improper influence or interference with his independence.

41.     After his September 12, 2017 presentation, the Retirement Board voted to approve Mr. Hudecek's recommendation to prospectively reduce the Retirement Plan's discount rate from 7.3% to 5% for purposes of all withdrawals from the Retirement Plan occurring after December 31, 2017 in accordance with Section 12.4 of the Retirement Plan's Plan Document.

**C.     CCEA's Disaffiliation and Termination**

42.     On April 25, 2018, CCEA held an election for its membership to vote on whether to disaffiliate from NSEA and NEA.

43.     At the time its membership voted on whether to disaffiliate from NSEA and NEA, CCEA had approximately 10,915 members. Close to 1,000 individuals participated in the election and over 90% voted in favor of disaffiliation.

44.     On April 26, 2018, CCEA sent a letter to Lily Eskelsen-Garcia, NEA President, giving notice of its disaffiliation from NEA and NSEA and stating, "accordingly, we will no longer have any contractual relationships with NEA and NSEA."

45.     On or about April 30, 2018, Vijaya Krishna contacted David Hudecek and informed him of CCEA's disaffiliation from NEA as well as the potential for the Executive Committee to terminate CCEA's participation in the Retirement Plan.   Mr. Hudecek began preparing a calculation of the withdrawal liability that would be owed by CCEA should it withdraw during the 2018 Plan Year.

46.     On May 1, 2018, the NEA Executive Committee met for a regular meeting and, at such meeting, voted to terminate CCEA as a contributing employer to the Retirement Plan in accordance with Article 12, Section 12.2 of the Plan Document.

47.     On May 11, 2018, John Stocks, Executive Director of NEA, sent a letter to CCEA notifying CCEA of its termination as a contributing employer to the Retirement Plan effective August 31, 2018 in accordance with Article 12, Section 12.2 of the Plan Document.

48.     On August 29, 2018, the Executive Committee adopted an amendment to the Retirement Plan's Plan Document terminating CCEAs participation as of August 31, 2018.

**D.      Withdrawal Liability Assessment and Arbitration**

49.     CCEA's termination from the Retirement Plan resulted in a permeant cessation of its obligation contribute to the Retirement Plan thereby effecting a "complete withdrawal" from the Retirement Plan within the meaning of Section 4203(a) of ERISA, 29 U.S.C. § 1383(a). This withdrawal from the Retirement Plan occurred during the Plan Year from January 1, 2018 to December 31, 2018.

50.     Mr. Hudecek calculated CCEA's withdrawal liability using a discount rate of 5% to value the Retirement Plan's UVBs based on a withdrawal date of August 31, 2018.  Mr. Hudecek determined that CCEA owed $3,246,349 in withdrawal liability, or alternatively, 66 monthly installment payments of $57,001 plus a final partial monthly payment of $29,309.

51.     On August 1, 2018, the Retirement Plan issued a "Notice of Withdrawal Liability Assessment and Demand for Payment" ("Withdrawal Liability Assessment") to CCEA informing it of its withdrawal liability in accordance with Sections 4202(2) and 4219(b)(1) of ERISA, 29 U.S.C. §§ 1382(2) and 1399(b)(1).

52.     On October 8, 2018, CCEA's timely filed a Request for Review of the Retirement Plan's withdrawal liability assessment, pursuant to Section 4219(b)(2)(A) of ERISA, 29 U.S.C. § 1399(b)(2)(A).

53.   On February 8, 2019, CCEA sent a Demand and Notice for Arbitration to the Retirement Plan and the American Arbitration Association ("AAA") pursuant to Section 4221 of ERISA, 29 U.S.C. §1401. The AAA appointed Arbitrator Adam P. Segal to hear the arbitration case. CCEA amended the Demand and Notice for Arbitration on February 15, 2019.

54.   On March 19, 2019, the Retirement Plan timely responded to CCEA's Request for Review.

55.   In advance of the arbitration hearing, the Parties stipulated to relevant facts and to the following statement of the issues:

   a.   Whether CCEA withdrew from the Retirement Plan during the Plan Year from January 1, 2018 to December 31, 2018?

   b.   Whether the actuarial assumptions and methods used by the Retirement Plan to calculate CCEA's withdrawal liability met the requirements of 29 U.S.C. § 1393(a)(1)?

   c.   Whether the Retirement Plan had and failed a legal obligation to timely and properly provide CCEA with notice of the change in its actuarial assumption for the discount rate of 5% utilized for calculation of withdrawal liability?

   d.   Whether the Retirement Plan failed to comply with Section 12.4(b) of the Retirement Plan's Plan document?

56.   Three days of hearings were held before Arbitrator Segal via video conference on June 15-16 and 19, 2020. At the hearing, numerous exhibits were entered into evidence, including transcripts of depositions, and each party presented multiple witnesses to testify, including an expert actuary to testify in support of each party's respective position.  After the hearing, the Parties filed with the Arbitrator Post-Hearing Briefs on August 17, 2020, Reply Briefs on September 9, 2020, and Supplemental Briefs on September 11, 2020 and September 15, 2020.

57.   Arbitrator Segal issued the award pursuant to a statutorily mandated arbitration process under Title IV of ERISA, 29 U.S.C. §§ 1381-1453, and pursuant to the Federal Arbitration

Act, 9 U.S.C. § 1 *et seq.*  The procedure governing such arbitration was conducted in accordance

with rules established by AAA, as authorized by the PBGC.  Exhibit B, Article 12, Section 12.4(g);

*see also,* 29 C.F.R. § 4221.14, 84 Fed. Reg. 67848 (December 10, 2019), 51 Fed. Reg. 22585 (June

20, 1986), 50 Fed. Reg. 38046 (Sept. 19, 1985).

58.     In a Decision and Award dated November 20, 2020, Arbitrator Segal affirmed in

part and overturned in part the Retirement Plan's assessment of withdrawal liability against CCEA.

59.     The Award made the following findings:

1.     The Plan's determination that CCEA completely withdrew in 2018 is upheld.

2.     Actuaries are not required to use the same discount rate for funding and withdrawal
       liability purposes, because the assumptions serve different purposes under the
       actuarial standards and each may be the "best estimate" for the given purpose.

3.     The "settlement theory" view of withdrawal liability discount rates is a reasonable
       basis on which to set a rate lower than the funding rate, and a fixed low risk
       investment rate may be selected.

4.     A single actuary recommending two materially different "best estimates" for a
       withdrawal liability discount rate indicates a lack of appropriate actuarial process
       and does not render a "best estimate" that satisfies the MPPAA where: both rates
       are purportedly based on the same actuarial study; one is a new rate after years of
       using the other; and the change was made suddenly and without reference to,
       identification or consideration of any factors that were new, changed, or arose
       between adoption of the different rates.

5.     A withdrawal liability discount rate that is not an actuary's best estimate is
       unreasonable.

6.     Absent offsetting changes to other assumptions, the unreasonable withdrawal
       liability discount rate here was so impactful that it caused the actuarial assumptions,
       in the aggregate, to be unreasonable.

7.     In addition, the Plan in this case requires, by Plan rule, a reasonable withdrawal
       liability discount rate in isolation from the aggregate assumptions.

8.     The Plan in this case has also adopted a plan rule setting the funding interest rate
       as the default withdrawal liability rate. Having done so, the Plan was required to
       provide an employer notice pursuant to 29 U.S.C. § 1394(b) regarding the change
       to the withdrawal liability discount rate in order to comply with the text, intent, and

purpose of that section regarding the plan rules, especially in light of the Plan's failure to provide CCEA with annual funding notices.

9.      The withdrawal liability assessment in this case must be recalculated using the 7.3% withdrawal liability discount rate applicable prior to the change to 5% and any overpayments must be refunded with interest in accordance with MPPAA and the regulations thereunder.

10.     In light of the complex area of law and unique facts of this case, this Award is stayed until the later of (1) the time limit for either party to challenge this Award in court has expired or (2) the resolution in court of any such challenge, except that CCEA may cease interim withdrawal liability payments unless and until reinstated upon review.

Exhibit A.

60.     While the Arbitrator properly determined certain aspects of this case, such as his conclusion that CCEA withdrew from the Retirement Plan during the Plan Year from January 1, 2018 to December 31, 2018 and that the 5% discount rate assumption used by the Retirement Plan to calculate withdrawal liability was reasonable, the Arbitrator also made a number of errors of law, including, but not limited to, the application of an incorrect standard to its review of the Retirement Plan's factual determinations.  These errors, *inter alia,* led to erroneous and improper conclusions of fact.  Among other things, the Arbitrator erroneously shifted the burden to the Retirement Plan to affirmatively prove that the discount rate assumption for withdrawal liability was the actuary's "best estimate" in clear contravention of ERISA Section 4221(a)(3)(B), 29 U.S.C. § 1401(a)(3)(B); incorrectly interpreted Section 12.4 of Retirement Plan's Plan Document in a manner inconsistent with the deference due to the Retirement Board's and Executive Committee's interpretation of their own governing documents to lower the standard of proof for withdrawing employers to contest the Retirement Plan's withdrawal liability calculations; and improperly imposed a notice requirement on the Retirement Plan that is not contained anywhere in ERISA.  Moreover, the Arbitrator applied a legally incorrect definition of

the "best estimate" requirement under ERISA Section 4231(a)(1), 29 U.S.C. § 1393(a)(1), thereby ignoring the unrefuted record evidence that the selection of the 5% discount rate for withdrawal liability was entirely the Retirement Plan Actuary's own determination and was not the product of improper influence.  Additionally, the Arbitrator's Award was largely premised on at least one erroneous factual determination – that the Retirement Plan failed to provide CCEA with required Annual Funding Notices – which was directly refuted by the uncontradicted record, including by copies of the actual notices that were submitted as joint exhibits during the hearing.

61.     As such, the Retirement Board seeks an order enforcing in part and vacating/modifying in part the Award to uphold the Retirement Plan's assessment of withdrawal liability against CCEA in full.

**E.     Delinquent Contributions owed to the Retirement Plan**

62.     Prior to its withdrawal from the Retirement Plan, CCEA was required to pay contributions to the Retirement Plan, as set forth in the Retirement Plan's governing documents. Additionally, CCEA was required to contribute to the Plan on behalf of its bargaining unit employees under the terms of its collective bargaining agreement with the union representing those employees.  A complete and accurate copy of the Retirement Plan's Contribution and Collection Policy ("Policy") is attached as Exhibit C.  A complete and accurate copy of the collective bargaining agreement between CCEA and Clark County Staff Organization covering the period from June 12, 2017 to August 31, 2018 ("2017 – 2018 CBA") is attached as Exhibit D.

63.     Pursuant to Section 515 of ERISA, 29 U.S.C. § 1145, employers who are obligated to make contributions to a multiemployer employee benefit plan under the terms of a plan or a collective bargaining agreement must do so in accordance with the terms and conditions of the plan or agreement.

64.    Section 5.2 of the Plan Document requires contributing employers to make contributions "in such amounts as are necessary in addition to the contributions of [employees] to maintain the Plan on a sound actuarial basis and to meet minimum funding standards as prescribed by any applicable law." *See* Exhibit B, Section 5.2.

65.    Section 6.3(a) of the Plan Document authorizes the Retirement Board "[t]o establish rules for the administration of the Plan and transaction of its business." *See* Exhibit B, Section 6.3(a). Thus, pursuant to Section 6.3(a) of the Plan Document, the Retirement Board established the Policy. Accordingly, CCEA is obligated to remit contributions to the Retirement Plan in accordance with the Policy.

66.    Pursuant to the Sections 1.5 and 1.6 of the Policy, contributing employers are required to make contributions to the Retirement Plan equal to their respective total annualized payroll for their Retirement Plan participants as of January 1 of each year times a fixed percentage established by the NEA Executive Committee.  *See* Exhibit C, Sections 1.5 & 1.6.

67.    Section 2.1 of the Contribution and Collection Policy requires that employer contributions be paid no later than the 15th day of the month following the month for which the contribution is paid. *See* Exhibit C, Section 2.1.

68.    Sections 2.2 and 3.2 of the Contribution and Collection Policy provides that employers that fail to timely remit employer and employee contributions must pay interest on the outstanding contributions at a rate of 10% per annum, compounded monthly, from the date due to the date paid. *See* Exhibit C, Sections 2.2 & 3.2.

69.    Section 4.5 of the Contribution and Collection Policy provides that an employer delinquent in its contribution obligations to the Retirement Plan and the subject of a collection lawsuit is liable is additionally liable for liquidated damages at the greater of the interest on the

delinquent contributions or twenty percent (20%) of the delinquent contributions, as well as attorneys' fees and costs. *See* Exhibit C, Section 4.5.

70.     For all times periods applicable here, CCEA was required to contribute to the Retirement Plan on behalf of its employees pursuant to the Plan Document, CCEA's collective bargaining agreements with its staff union, and certain employment agreements with individual employees.

71.     For the Plan year from January 1, 2018 to December 31, 2018, CCEA's required contribution rate to the Retirement Plan was 33.22% of its annualized first payroll of the year.

72.     Pursuant to Appendix A-5, A.01(y) of the Plan Document, CCEA does not require any employee contributions. Accordingly, the full 33.22% rate was owed as an employer contribution.  *See* Exhibit C at Appendix A-5, A.01(y).

73.     Based on self-reporting by CCEA and the Retirement Plan's salary records for CCEA's participants, CCEA's total annualized payroll on January 1, 2018 for its Retirement Plan participants was $1,333,114.50.

74.     Based on 33.22% of $1,333,114.50 in total annualized payroll on January 1, 2018 for CCEA's Retirement Plan participants, divided over 12 months, the Retirement Plan calculated CCEA's contributions for 2018 to be $36,905.05 due monthly.

75.     For the 8 months between January and August 2018, when it withdrew, CCEA was required to pay the Retirement Plan a total of $295,240.40 in contributions. For the same period, CCEA has paid only $247,696.73 in contributions and many payments were submitted late, resulting in a net remaining delinquency of $47,543.67 in unpaid contributions, $20,321.34 in interest (calculated through December 1, 2020) on unpaid and late paid 2018 contributions, and $20,321.34 in liquidated damages as a result of the initiation of this lawsuit.

76.     During the period in which CCEA continued to participate in the Retirement Plan but failed to pay its required contributions, its employees continued to earn benefits under the Retirement Plan, which the Retirement Plan is required to pay notwithstanding CCEA's failure to pay its contributions in full.

77.     Pursuant to ERISA Sections 502(h) and 4301(g), 29 U.S.C. § 502(h), copies of this Complaint will be served on the Secretary of Labor, the Secretary of the Treasury, and the PBGC.

**COUNT I**
**ENFORCE IN PART AND VACATE/MODIFY IN**
**PART ARBITRATION AWARD**

78.     Plaintiffs reallege and incorporate herein Paragraphs 1 through 77.

79.     In the Award, Arbitrator Segal properly affirmed the Retirement Plan's determination that CCEA incurred a complete withdrawal from the Fund in 2018 and that the 5% discount rate used by the Retirement Plan for purposes of valuing its liabilities for withdrawal liability was reasonable under the applicable actuarial standards.

80.     However, in the Award, Arbitrator Segal also made a number of erroneous legal determinations which led him to incorrectly conclude that the 5% discount rate used by the Retirement Plan for purposes of valuing withdrawal liability was not the actuary's "best estimate" as required under Section 4231 (a)(1), 29 U.S.C. § 1393(a)(1).

81.     These erroneous legal determinations include, but are not limited to, improperly shifting the burden to the Retirement Plan to affirmatively prove that the discount rate assumption for withdrawal liability was the actuary's "best estimate" in clear contravention of ERISA Section 4221(a)(3)(B), 29 U.S.C. § 1401(a)(3)(B), applying the wrong legal standard regarding the meaning of the "best estimate" requirement under ERISA Section 4231 (a)(1), 29 U.S.C.

18

§ 1393(a)(1), and wrongly interpreting Section 12.4 of Retirement Plan's Plan Document in a manner inconsistent with the deference due to the Retirement Board's and Executive Committee's interpretation of their own governing documents to lower the standard of proof for withdrawing employers to contest the Retirement Plan's calculations.

82.     Additionally, Arbitrator Segal's Award erroneously imposed a notice requirement on the Retirement Plan that is not contained anywhere in ERISA. Arbitrator Segal's conclusion was the product of both legal and factual errors, which include, but are not limited to, holding that the Retirement Plan was required to notify CCEA off the change in the actuarial assumptions used to calculate withdrawal liability and inaccurately finding that the Retirement Plan failed to provide CCEA with Annual Funding Notices, as required by Section 101(f) of ERISA, 29 U.S.C. § 1021(f), despite the undisputed record evidence that such notices were provided.

83.     Plaintiffs have a right to petition this Court to enforce, vacate, or modify Arbitrator Segal's Award under Sections 4221(b)(2) and (3) of ERISA, 29 U.S.C. § 1401(b)(2) and (3).

84.     Applying the presumptions and burden of proof of ERISA Section 4221(a)(3), 29 U.S.C. § 1401(a)(3), applicable regulations, applicable Actuarial Standards of Practice, and relevant case law, to the facts of this dispute as presented at the arbitration hearing, the Arbitrator committed clear error in finding that the 5% discount rate used by the Retirement Plan for purposes of valuing withdrawal liability was not the actuary's "best estimate" and that the Retirement Plan was required to notify CCEA of the change to the discount rate used for withdrawal liability purposes.

85.     Accordingly, Plaintiffs are entitled to an order enforcing in part and vacating and/or modifying in part Arbitrator Segal's Award to uphold the Retirement Plan's assessment and calculation of withdrawal liability against CCEA in full.

86.     Plaintiffs are also entitled to their costs and expenses incurred in connection with this action, and their reasonable attorney's fees, pursuant to Section 4301(e) of ERISA, 29 U.S.C. § 1451(e).

## COUNT II

## DELINQUENT CONTRIBUTIONS, INTEREST, AND LIQUIDATED DAMAGES

87.     Plaintiffs reallege and incorporate Paragraphs 1 through 86.

88.     This claim arises under Sections 502(a)(3) and 515 of ERISA, 29 U.S.C. §§ 1132(a)(3) and 1145.

89.     CCEA is obligated, pursuant to the Plan Document and the 2017-2018 CBA, to make contributions to the Retirement Plan on behalf of its covered employees.  CCEA has failed and refused to fulfill its contractual obligations and owes contributions attributable to July and August 2018. CCEA's failure to timely submit contributions has resulted in the assessment of interest and liquidated damages pursuant to ERISA and the Retirement Plan's governing documents.

90.     Specifically, CCEA has failed to remit $47,543.67 of the total $295,240.40 contributions due for the period from January 2018 to August 2018. CCEA is delinquent in the amounts of $47,543.67 in unpaid contributions, $20,321.34 in interest (calculated through December 1, 2020) on unpaid and late paid 2018 contributions, and $20,321.34 in liquidated damages as a result of the initiation of this lawsuit.

91.     Prior to commencing this lawsuit, the Retirement Plan sent several letters and other communications in its efforts to obtain the outstanding contributions and interest, owed. CCEA continues to refuse to pay the amounts due. There is little prospect that, lacking judicial compulsion, CCEA will satisfy its obligations to the Retirement Plan, and pay the delinquent and unpaid contributions, interest, and liquidated damages due to the Retirement Plan.

92.    CCEA's continued failure to submit contributions have caused irreparable harm to the Retirement Plan's participants in the form of loss of earnings and additional expenses for the Retirement Plan, endangered the eligibility of covered members' pension benefits, and other harm. Under Section 502(g) of ERISA, the Retirement Plan is entitled to recover all costs of this action from CCEA, including reasonable attorneys' fees and court costs.

**WHEREFORE**, Plaintiffs respectfully request that the Court:

1.    Enter judgment against CCEA and in favor of the Retirement Plan enforcing in part and vacating/modifying in part Arbitrator Segal's Award dated November 20, 2020 in the AAA arbitration case styled *Clark County Education Association v. Employees' Retirement Plan of the National Education Association,* AAA Case Number: 01-17-0001 to uphold the Retirement Plan's withdrawal liability assessment and calculation against CCEA in full;

2.    Retroactively reinstate CCEA's obligation to make its withdrawal liability installment payments as set forth in the Retirement Plan's assessment;

3.    Enter judgment against CCEA for $47,543.67 in unpaid contributions, with interest and liquidated damages through the date of payment;

4.    Award the Retirement Plan its attorney's fees, costs, and expenses incurred in connection with this action pursuant to ERISA Sections 502(g)(2), 4301(e), 29 U.S.C. §§ 1132(g)(2), 1451(e), and

5.      Grant such further relief as the Court may deem appropriate.


                              Respectfully submitted,

                               _/s/ Olga M. Thall__

                              Paul A. Green,  DC Bar No. 383588
                              Lauren P. McDermott, DC Bar No.
                              1008301
                              Olga M. Thall, DC Bar No. 1016248
                              Mooney, Green, Saindon,
                              Murphy & Welch, P.C.
                              1920 L. Street, NW, Suite 400
                              Washington, DC 20036
                              (202) 783-0100
                              (202) 783-6088 facsimile
                              pgreen@mooneygreen.com
                              lmcdermott@mooneygreen.com
                              omthall@mooneygreen.com

                              *Counsel for Plaintiffs*




Dated: November 25, 2020